George R. Foster et al. v. D. G. Ambler—Syllabus.

GEORGE R. FOSTER ET AL., APPELLANTS, vs. D. G. AMBLER, APPELLEE.

1. In a case where the bill seeks an account on alleged liability of the defendant, and the court gives a decree for the plaintiffs, with directions to the master appointed to take the account, which are unsatisfactory to the plaintiffs, and from which they take an appeal, this court will consider the whole case, and reverse the decree against the defendant, if found to be erroneous in charging him with any liability.

2. Where the sworn answer to a bill denies the allegations essential to sustain the case of the plaintiffs, the plaintiffs will fail if they do not overcome the answer by the evidence of two witnesses, or of one witness and sufficient corroborating circumstances. This case for the plaintiffs is founded on an alleged trust accepted by the defendant on a transfer of their stock in the Jacksonville and St. Augustine Railroad Company to him, which trust he denies in his sworn answer, claiming that the transfer was under an absolute sale of the stock to him, and the denial of the answer not being overcome, in the opinion of this court, by the evidence required: *Held*, that the decree charging the defendant with liability under the alleged trust is erroneous.

3. Authority to third parties to transfer stock, expressing that it was given on receipt of full consideration, if coupled with a secret trust, does not carry the trust to the party to whom they sell and transfer the stock, unless knowledge of such trust is brought home to him. The breach of trust, if any, is in such case chargeable to the parties having authority to transfer.

4. When stock is offered for sale to an officer of a company, by one holding written authority of the character above indicated, there is no rule of law which requires him to enquire the purpose of the sale. He would only be put upon enquiry when he has knowledge

of such facts as would lead an honest man, using ordinary caution, to make further enquiries, and be taken to have notice of facts about which enquiry should be made, when with such knowledge he does not make the enquiry, but avoids making it.

5. If one gives to another such evidence of right to sell his property as, according to common understanding, accompanies authority of disposal, he loses the right of reclaiming the property if disposed of under that authority to an honest purchaser for a valuable consideration without notice of any adverse claim. If a trust goes with the authority such purchaser would not be held as taking the property subject to the trust.

6. The rule that a purchaser of property from a third party encumbered with a trust cannot hold against the true owner if the consideration of the purchase is only an antecedent debt, does not apply where there is further consideration in the surrender of a valuable security for the debt.

Appeal from the Circuit Court for Duval County.

The facts of the case are stated in the opinion.

*H. Bisbee* for Appellants.

*Fleming & Daniel* for Appellee.

THE CHIEF-JUSTICE delivered the opinion of the court:

Appellants filed their bill against appellee in the court below on the 24th day of December, 1879, praying an account for the proceeds of certain stock in the Jacksonville and St. Augustine Railroad Company, sold by him, which stock at one time belonged to them, and for payment of said proceeds to them, with interest. The substance of the bill is that on or about February 28th, 1874, the complainants were stockholders in said company, which was incorporated in 1870, for the purpose of building and operating a railroad between the two cities named, and that of the five thousand shares of stock of one hundred dollars each, they owned and controlled among them three thousand and

seventy-six shares, being a majority of said stock, while the defendant, who was one of the Directors and Vice-President of the company, owned and controlled one thousand, one hundred and fifty-three shares. That complainants had contributed much time, labor and money to secure the building of the road, but without success. That thereupon defendant, a banker, and having, or pretending to have, ample facilities for raising money and for securing the co-operation of capitalists in the work, represented to complainants that certain capitalists were ready to unite with him in furnishing money and building the road if he and they could own and control a majority of the stock ; and he proposed the assignment of the several shares of stock of complainants to him in order to secure the building of the road. He further agreed to cancel and surrender a promissory note for $500, signed by the President and endorsed by complainants, Durkee and Driggs, which note was then held by him, and had been given on behalf of the company for moneys he had before that advanced towards its preliminary operations. That complainants being anxious to secure the building of the road, and willing to surrender their stock to that end, and relying upon the good faith of defendant and his ability to perform his agreement, accepted his proposition and caused to be assigned to one Maxey, as agent of defendant, their several shares of stock, it being understood that said Maxey should hold the stock for the use of defendant, or assign the same to him as he should direct, (said arrangement being at his instance and request,) in pursuance of the agreement, except that the shares of complainants, Reed and Foster, were assigned directly to defendant. He thereby got absolute control of the company, said assignments, however, being for the sole purpose of securing the building of the

road, and upon the express condition that he would secure that. Thus defendant was made a trustee to hold and use said shares of stock for the purpose aforesaid, the same to be his property if he accomplished the purpose, but to be re-assigned to complainants if he did not.

It is then alleged that defendant sometimes pretends that said stock was sold and assigned to him for a valuable consideration, but complainants say that the only consideration intended and understood in any written assignment was the building of the road. The defendant also pretends that he purchased and paid for said stock, the consideration being the cancellation and surrender of the promissory note aforesaid, but complainants deny this, and say that such cancellation and surrender was part and parcel of the agreement before recited, it being understood that upon getting the assignment defendant should also assume and discharge all liabilities of the company; and in alleging that the only consideration for the assignment was the building of the road, it is further said that defendant acquired no other right, title or interest in the stock than as trustee for the purpose mentioned.

Nevertheless, complainants say, after the assignment aforesaid the defendant, regardless of the trust, continued to hold the stock for a long time, but did not secure the co-operation of capitalists or the building of the road; and afterwards, about 18th of March, 1875, in violation of his trust and without the knowledge or consent of complainants, and for the purpose of defrauding them and preventing the construction of the road, and for his own personal benefit, defendant sold and assigned a majority of said stock, including that of complainants, to the St. Johns Railway Company, a corporation running a line of railroad from St. Augustine to Tocoi, on the St. Johns river, said

sale being for the sum of $4,000, which was received and appropriated by defendant to his own use.

The St. Johns Railway Company was interested in preventing the construction of the Jacksonville and St. Augustine Railroad, because it was a competing line; and the defendant at the time of the sale aforesaid was largely interested in the St. Johns company, was a stockholder and an officer or agent of said company, and he sold the stock to enable it to control the Jacksonville and St. Augustine Railroad Company, and thereby prevent the construction of its railroad.

All which actings of defendant were not known to complainants until recently, and upon discovery thereof they demanded return of said stock or an accounting and settlement for the proceeds thereof, which defendant refused. Complainants believing that the sale of said stock was made without notice to the St. Johns Railway Company, elect to waive the violation of the trust, and demand of defendants the proceeds of the sale.

The answer of defendant denying that complainants, Jenkins and Driggs, ever were stockholders of the Jacksonville and St. Augustine Railroad Company, also denies that the remaining complainants ever owned or controlled a majority of the stock of said company, and further denies that they had severally contributed a great deal of time, labor and money in the preliminary work of the company. Admitting that he is a banker, as alleged, he denies that he had or pretended to have ample facilities for securing co-operation of capitalists who would invest money in the construction of the road, or that he represented to complainants that any capitalists were ready to unite with him in furnishing the necessary money to build the road, if he and his associates could control a majority of the stock of the company. He denies the alleged proposition to com-

plainants that if they would assign their stock to him he would secure the building of the road, or that he made any promises, pretenses or representations to them, or either of them, at all similar to those alleged in their bill. Says that Bridge, one of the stockholders and a director of the company, was cashier of defendant from March 15th, 1870, to August, 1873.

He says the stock of the company was purely speculative, no money having been paid in on it, and that the company was wholly without money to prosecute their plans, or do what was necessary to preserve the charter. That at the request of the company and of Durkee and Bridge he advanced from his bank about May 11th, 1872, the sum of $550 on a note at four months, signed by the President of the company and endorsed by complainants, Durkee and Driggs, which note was not paid when due, and was duly protested. That besides said note, Bridge, in his efforts in behalf of the company, became largely indebted to defendant's bank for moneys advanced to enable said Bridge to carry on negotiations for capital to build the road, all of which was due and unpaid at the time of the transactions set forth in the bill. That about February 28th, 1874, certain stockholders, among them complainants Ledwith, Driggs, Durkee, Bridge, Cheney, Jenkins and ReQua, joined in an order to Driggs, as secretary of the company, directing him, at the request of Durkee and Bridge, to transfer all stock of the company in their names to the name of (left blank), reciting in said order that they had severally received from said Durkee and Bridge full consideration for the same. That on the 23d of July, 1874, said order was delivered to defendant by Durkee and Bridge, endorsed as follows: " John S. Driggs, Esq., Secretary Jacksonville and St. Augustine Railroad Company: Sir—You will please transfer the within named stock to

such name as may be directed by D. G. Ambler, Esq., of this city.

"SAMUEL I. BRIDGE,
"J. H. DURKEE."
"Jacksonville, July 23d, 1874."

That thereafter defendant directed said Driggs to transfer said stock to Thos. H. Maxey, and on the 25th of May, 1876, the said Driggs, as Secretary, &c., filled the blank in the order with the name of said Maxey, and issued to him 3,058 2-13 shares of stock.

That Maxey at said date was cashier of defendant's bank, and the stock so issued to him was for the benefit of the St. Johns Railway Company, to whom it had been sold by defendant. That the assignment of said order to defendant by Durkee and Bridge was not at defendant's instance, but at the suggestion of said Bridge, and with full consent and knowledge of Durkee, and not for the purpose alleged by complainants, but as a consideration to defendant for the surrender of the promissory note of $550 aforesaid, and of the further sums advanced by defendant to said Bridge out of his bank for the use and benefit of said railroad company. That defendant surrendered the note and released the company and said Durkee and Driggs from all liability therefor, and that he then considered and avers that he thereby became owner of said stock. That at the time it was assigned to him in 1874, Durkee and Bridge well knew that he was largely interested in the stock of the St. Johns Railway Company; and he admits that about the 18th of March, 1875, he did sell to said company three thousand shares of stock of the Jacksonville and St. Augustine Railroad Company for about $4,000, but he says that of this stock 1,153 11-13 shares were his own original stock. The remaining shares were of the stock transferred to him by Durkee and

Bridge, 249 of which had been owned by Bridge, 349 by C. L. Mather, and 349 by ReQua, who assured defendant that he did not authorize the use of his name in this suit.

Defendant denies that the sale of the three thousand shares of stock aforesaid involved any breach of trust towards complainants or either of them. The stock was his own, and there was no attempt on his part to conceal the transaction of sale, the transfers all being made by the Secretary of the company, one of the complainants. Denies that he made promises, as alleged, that he would transfer the stock to parties who would build the road, or that there was an understanding that the stock was to be re-assigned to the original holders if the road was not built by him or his associates. Says he did not realize from the sale of the stock more than enough to reimburse him for his loans, advances, expenses and trouble in the matter. That nearly five years have elapsed since the transactions complained of, and during this time complainants have been fully aware of them, but only at this late day attempt to assert any claim to the proceeds of sale, or that defendant had violated any trust in effecting the sale. Defendant denies that complainants or either of them suffered any loss through his said stock transactions, and repeats that they paid nothing for their stock, and that it had no value to them.

After replication a special Master was appointed to take testimony, and upon the coming in of his report a hearing was had on the pleadings and proofs, and a decree rendered against appellee, adjudging him liable as trustee for the moneys received by him on the sale of the stock of the Jacksonville and St. Augustine Railroad Company to the St. Johns Railway Company, and appointing a Master to take and state an account, giving certain directions to him as to credits to be allowed appellee and as to computation of interest. Appellants being dissatisfied with these di-

rections, appealed, and assign for error that the directions were wrong. It is unnecessary, in the view we take of the case, to recite the directions or the errors assigned against them, since we conclude that the court erred in decreeing that appellee was liable to appellants at all.

Appellee claims here the benefit of the rule that the appeal opens the whole case, and that if the decree against him on which the directions for an account are based is erroneous, he is entitled to have it reversed. Southern Life Ins. & Tr. Co. vs. Cole, 4th Fla., 359 ; Fairchild vs. Knight, 18 Fla., 770. The rule is not contested by appellants.

We proceed, then, to consider whether it is established by the evidence that appellee is liable as trustee for the stock sold by him. · Admitting assignment of the stock to him and the sale of same, he by his answer fully denies all the other material statements of the bill on which his alleged liability is founded. It must appear, theretore, that those allegations are sustained by the proofs, viz: that appellee represented to appellants that certain capitalists were willing and ready to unite with him in furnishing money to build the road, if he and they could own and control a majority of its stock, and proposed the assignment of their several shares to him in order to secure its being built; that they, relying on his good faith and his ability to perform his agreement, accepted his proposition and caused to be assigned to Maxey, as agent of appellee, their shares of stock—it being understood that Maxey. should hold these for the use of appellee, or assign the same as he should direct, in pursuance of the agreement, this arrangement being made at his instance and request; that said assignment was for the sole purpose of securing the building of the road, and upon the express condition that he would secure that; and that the stock was to be his if

he accomplished the purpose, but to be re-assigned to appellants if he did not.

Beginning with the evidence according to the sequence of events, we find that on the 28th of February, 1874, Durkee, Bridge, Driggs, Jenkins, Cheney, Mather, Ledwith, Adams and ReQua addressed to John S. Driggs, Secretary of Jacksonville and St. Augustine Railroad Company this paper:

" Sir: At the request of Joseph H. Durkee and Samuel J. Bridge, you will please transfer all stock standing in my name upon the books of said company to the name of ————, I having received from said Bridge and Durkee full consideration for the same."

Next, that on the 23d of July, 1874, Bridge and Durkee addressed to John S. Driggs, Secretary as aforesaid, this:

" Sir: You will please transfer the within named stock to such name as may be directed by D. G. Ambler, of this city "—meaning Jacksonville, and the stock referred to in the preceding paper.

Then follows, endorsed by John S. Driggs, Secretary and Treasurer, on the paper of February 28th, 1874, this:

" Transferred the shares of the subscribing parties (stockholders) to T. H. Maxey, on May 25th, A. D. 1876, 2,029 12-13 shares," the blank in said paper having been filled with the name of Maxey.

Appellee had sold the stock, including his own, to the St. Johns Railway Company March 15, 1875, but transferred it to Maxey to make the transfer to said company, which latter was done, as the certificate of transfer shows, on the day of the endorsement above mentioned.

The testimony in behalf of appellants as to what led to the transactions shown by the foregoing papers is that of four of the appellants, Ledwith, Durkee, Driggs and Cheney. .

Ledwith says he transferred his stock to Ambler in consequence of representations made to him by Bridge, that if the stock could all be placed in the hands of Ambler, the road would be built to St. Augustine, and Bridge stated that " negotiations were being made with a party from Brooklyn, N. Y., through whose assistance the road could be constructed." He says that Bridge was cashier of Ambler's bank at the time, and represented himself as agent of Ambler; and that he (Ledwith) transferred his stock to Ambler for no other consideration than that Ambler would build the road from Jacksonville to St. Augustine. On cross-examination he stated the number of shares of stock he owned, but said he did not remember that he made any contribution of money to the company ; and that he did not remember when or in what way the transfer of his stock was made to Ambler, but it followed and was in consequence of representations made to him by Bridge, who, according to his own statements, had authority to act in the matter for Ambler. But witness never had any conversation on the subject with Ambler himself.

Durkee says that Dockray, as President of the Jacksonville and St. Augustine Railroad Company, was in frequent negotiations with Bridge looking to the building of the road. They had talked over several schemes with witness and had, he believed, visited New York on the business of the road, but had not succeeded in inducing capitalists to aid them. They represented to him that there would be greater chances of success if the stock was held and controlled by a single party. Such representations were frequently made. He cannot recall exactly how the transfer was made finally, but has the impression that it was made in blank, to be filled to such party as Dockray, Bridge and Ambler might dictate—the transfer will show. He thinks

he talked with other stockholders, and suggested the propriety of making the transfers sought, as he thought from representations made to him by Dockray and Bridge, such a course would bring about the building of the road. He does not remember any conversation with Ambler in regard to the re-transfer of the stock. The stockholders were very anxious for the building of the road, and were willing to place the stock in the hands of any one who would accomplish that; and as Dockray and Bridge had represented that they could find parties who would build it if the stock was in their control, the stockholders were perfectly willing to let them try the experiment. Witness believed that Bridge and Ambler were in some way connected in the enterprise, because Ambler had advanced moneys to Dockray and Bridge in connection with it. Bridge was cashier of Ambler's bank, but witness cannot say whether he was so at the time the stock was transferred. Maxey was at the time, or had been previous thereto, clerk or collector in the bank.

The original intention, according to memory of witness, was to transfer the stock direct to Ambler, but he objected and the transfer was made differently. Witness, jointly with Driggs, endorsed the note given by the President of the company, and discounted by Ambler, for $550, but no notice of protest has been served, but as his name was on the note as endorser he considered himself morally bound to protect it, and this was an additional incentive to the transfer of his stock.

The note was returned to him. The negotiations for a transfer of his stock did not originate and were not consummated in a purpose of satisfying his liability on the note, but originated in a purpose before stated, and in the consummation of the transfer he was willing to accept the note as a consideration in the transfer.

On cross-examination witness says he does not remember any call for payments upon stock, nor that anything had been paid on it directly, but he had paid out about $150 in furtherance of the enterprise. When asked if any inducements were offered him by Ambler, he answers that he had some conversation with Ambler, but cannot recall the nature of it, except that Ambler declined to have the stock transferred directly to himself. He cannot recall when the transfer was made, and is unable to say when the conversation with Bridge and Dockray occurred. He was mainly induced to transfer his stock upon assurances from Bridge that if he did so the road would be built. Was a Director in the company at the time the note above referred to was made, and a citizen of Jacksonville then and ever since. Was interested in the enterprise from the first subscription of stock, and from representations made by its President a good deal of confidence was felt in his ability to find capitalists to build the road; and afterwards when Bridge became a stockholder, he and the President were equally confident of finding capital. We were all laboring through them, as they expressed confidence in their ability to get the necessary capital. When asked the practical results of so many years of labor towards the work, his reply was: "For myself, the expenditure of $150 without any return. To the company, the absorption of the stock by a single individual, and its sale to a rival corporation."

Driggs, being shown the paper of February 28th, 1874, addressed to him by certain stockholders of the Jacksonville and St. Augustine Railroad Company, and being asked their purpose and object in transferring their stock, said he believed the object was to consolidate the stock of the company in the hands of some one person in order to facilitate the construction of the road. He supposed the transfer was to be to Ambler and to Bridge, his associate.

The impression of witness as to how he came to know that Ambler was to be the person who was to have control of the stock must, he says, have come from conversations held in the meetings of stockholders, irregular and informal. He cannot say whether Ambler was a stockholder at the time of the transfer. He had no talk with Ambler in person, but was present when Bridge had his conversation with the Directors on the subject. Heard Bridge state that the objects were to enable Ambler to perfect arrangements for the building of the road. No absolute sale for value, vesting in Ambler the ownership of the stock, was contemplated in the transfer, and he never heard such a sale mentioned or discussed. Ambler's place of business was in Jacksonville, where he resided, and Bridge was cashier or bookkeeper in his bank. Witness was Secretary of the company. Cannot testify that there was any regular or special meeting of stockholders or Directors at which the proposed transfer was brought up and discussed.

The meetings might have been of persons who held stock, probably a majority of it, for the purpose of informal conference. At many of such meetings Dockray, the President, was present, and think he was present at one or more of the meetings immediately preceding the transfer. Remember hearing Mr. Libby spoken of as one who would probably build the road, but cannot say as to what time he was so mentioned. Witness had not paid anything on a call on stock. As Secretary of the company he transferred, May 26th, 1876, to T. H. Maxey 2,029 12-13 shares of stock, and on same date gave a certificate for 1,028 2-13 to Thomas H. Maxey. The first lot of stock represented the shares of Durkee, Bridge, Cheney, Mather, Ledwith and ReQua, and the latter lot was made up from transfer of part of the stock previously issued to Ambler.

Cheney, an original stockholder and a Director till in

1872, testified, as to the ways and means relied upon to secure the construction of the road, that the company relied mainly upon negotiating its bonds and stock for that purpose. Being handed the paper of February 28th, 1874, and asked how the transaction therein stated arose, he said there had been a good many propositions and negotiations for building the road, principally conducted by the President, Dockray, under approval of the company, but all plans up to the date of this paper had failed. Shortly before its execution there was a good deal of talk between the stockholders and Bridge in regard to securing the construction of the road through Ambler. Thinks Durkee asked him if he was willing to transfer his stock to Ambler, telling him that if all the stockholders would do so, Ambler would agree to secure the construction of the road. Witness told him he was willing if by so doing the road would be built, but he wanted proper assurances before he would sign any agreement. A few days afterwards a meeting of stockholders was held, at which Ambler was present. Whether the meeting was formal or informal, he does not recollect. Ambler was Vice-President of the company, and Dockray, the President, was out of the country. The discussion at the meeting was as to the advisability of transferring the stock to Ambler to secure the building of the road. Ambler made a statement showing the necessity of having the stock in the hands of one person in order to secure capital, but witness does not recollect the words used, but when the meeting broke up it was the understanding that the stockholders would transfer their stock to Ambler for the purpose named. Durkee and Bridge were appointed a committee to carry out the arrangement, and a few days after one of them brought me the paper to sign, explaining that the stock was transferred to them to be transferred to Ambler as soon as they were satisfied the arrangement

could be carried out by him, whereupon witness signed the paper. Nothing was said about transferring the stock in payment of any debt. The proposition was that they should transfer it to him, he, or the person or persons to whom he should direct, taking it subject to all liabilities of the company and constructing the road—that is, the liabilities went with the stock, the consideration to the stockholders being the construction of the road, and Ambler to make what profit he could in building it. About two years before the transfer, Bridge first became a go-between between the company and capitalists whom he said he could secure. He was not then a stockholder, or in any way connected with the company. He said a Mr. Libby would build the road if a satisfactory proposition was made to him. The Directors authorized the President, Dockray, to confer with Bridge as to an acceptable proposition, it being understood that Bridge was authorized to represent Libby. Either at that time or shortly afterwards the stock was assigned to Bridge, and it was in connection with such negotiations with Libby, and one of the conditions of the proposition made by Bridge, who subsequently was the principal person in making the transfer to Ambler, and acted in the same capacity between the company and Ambler as between it and Libby.

On cross-examination witness said he did not remember whether he had ever paid any cash assessment on his stock, but from the fact that some of the stock was sold for non-payment of assessments and his was not, he infers that he did so pay. Being shown the record book of the company, and asked to designate the minutes of the meeting at which he had testified Ambler was present, he said the last meeting recorded here was in November, 1872, and there is no record of any stockholders' meetings since that date, and he can find no record of the meeting to which he referred.

He would call it an informal stockholders' meeting, frequent informal meetings having been held to discuss the various propositions, of which no record was made. The meeting was held in ReQua's block. He does not recollect all the parties present, but thinks most of those who signed the paper were there. This meeting and the assignment of his stock to Ambler have always been closely associated together in his mind, and he is correct in thinking the meeting was at the time and for the purpose stated by him. When asked if he had ever had any other interview or conversation with Ambler in regard to the matter, witness said he did not recollect ever speaking to Ambler on the matter. He never went to Ambler to ask what had been done with the stock, or whether arrangements were being made to build the road. First heard of the transfer to the St. Johns Railway Company in the fall of 1879.

Ambler, as witness in his own behalf, testified substantially the same as the statements and denials of his answer, but with more details. There is much of his testimony and of that of the other witnesses, as to the relations and dealings of Ambler with the St. Johns Railway Company, which we do not recite, for the reason that it is immaterial under the view which controls our decision of the case.

Is it shown that the stock was transferred to appellee in trust for the purposes alleged by appellants' bill? His sworn answer, sustained by his testimony, positively denies it; and in his testimony he adds this: " I had nothing to do with the inception of this paper (referring to the one dated February 28th, 1874,) or the obtaining of its execution, nor did I authorize any one else to obtain it or get the signatures thereto. I had no conversation with any of the signers before its execution in relation thereto. I offered no inducements to any of the signers for its execution, nor did I authorize any one else to offer any for me.

* * I made no assurance whatever in regard to the building of the road. I was not present when the paper was signed or discussed." He says further that " Bridge, during the spring of 1874, claimed to control absolutely the stock of the Jacksonville and St. Augustine Railroad Company, * and had been endeavoring to sell the stock to outside parties for the purpose of reimbursing himself and others for moneys expended or advanced for the use of the railroad, and also a commission for himself. He had failed to do so, and as the moneys expended by him * * were all out of my pocket, besides owing me other moneys, and I had myself advanced largely for the company, I tried to sell the stock to the parties who were going to build the St. Johns Railway for the purpose of getting my own money back and the moneys owing me by him." He says further that Bridge authorized him to sell the stock for the purpose of refunding him (witness) the amounts advanced by him or his bank to the company, or to him (Bridge) or others for the benefit of the company, and for his (Bridge's) account generally ; and that Bridge did not lead him to suppose there was any trust in the holding, but claimed to have absolute control with power to sell.

The evidence for appellants in regard to the transfer, the substance of which we have given, we deem insufficient to overcome the denials of appellee. The dealings of the stockholders were in the main with Bridge, and the impression under which they say they acted as to the purpose and conditions of the transfer were derived from him, and he was believed to be speaking as the agent of appellee. They all speak of him as cashier of appellee's bank at the time. But he had ceased to be cashier for something over six months, and appellee denies that he was acting as his agent, or had any authority to speak for him. The appellants do not disprove this, except by saying that Bridge

represented himself to them as agent. They had no conversation with appellee about the transaction. Durkee has an indistinct recollection of a conversation with him, in which he objected to the transfer being made to his name, but he does not state that he had any conversation with appellee in which the alleged objects and conditions of the transfer were spoken of. There is no other testimony showing that appellee could have had knowledge of these except what Cheney says as to the presence of appellee at a meeting of stockholders where the subject was discussed. We are left in uncertainty as to the time when this meeting was held, and the witness tells nothing of any part taken in it by appellee, who, for himself, says he did not attend any meeting of stockholders at which the transfer of stock was brought up and discussed, and does not know of any such meeting having been held. Cheney says he never had any conversation with him on the subject.

Thus stands the oral evidence on the principal question in the case, whether the transfer of stock to appellee was coupled with the alleged trust; and we think it fails to come up to the rule this court has announced, viz: that an answer denying the allegations of the bill is conclusive unless overcome by the testimony of two witnesses, or of one witness with corroborating circumstances. Stephens vs. Ormond, 10 Fla., 9. It cannot be correctly said that even one witness has given testimony to overcome the denials of the answer on the question. No sufficient proof having been adduced to show that the transfer of stock to the order of Durkee and Bridge was the result of any negotiations between the complaining stockholders and appellee, or of any agreement between them, the case broke down on the failure to establish the agency of Bridge.

It may be said as to corroborating circumstances that these rather favor appellee than appellants. No capital

had been paid in, all negotiations to procure any had failed, regular or formal meetings of stockholders had ceased since 1872, a new charter had been granted to others for the same road before the transfer of stock, and also the lands of the company had been taken away by the Internal Improvement Board of the State; the transfer to Durkee and Bridge was to the only parties claimed to be indebted to appellee on account of the company, their delay from February to July, 1874, in making transfer to appellee, his delay till May, 1876, in disposing of the stock, and the delay of complainants till 1879 in making any enquiry of appellee as to his disposition of it, would seem to indicate that the transaction of transfer was not one looking to any benefit to the stockholders other than the extinction of the liabilities of the company. Else why such long unconcern as to their rights? They saw that the railroad was not being built, and that others were in the field claiming right to build on their own account, and yet did not ask for the reassignment of the stock which they allege was to be made in case of failure of appellee to build the road.

Much of the argument for appellants is based on the assumption that the transfer of stock to appellee was made by them, but the evidence does not show this. Other argument is made on the ground that appellee, in taking transfer of the stock from Durkee and Bridge, was bound to take notice of the terms and conditions of the transfer to them; but this transfer on its face admits having received from them full consideration for the same, and Bridge, the active negotiator in the matter, left no question as to these words expressing the truth of the transaction, by leading appellee to believe that he controlled the stock. In this state of facts, appellee acted on the idea that the sale to him was an absolute one, and we think it is not shown that the nature of the transaction, or the relations of the

parties, was such as to necessitate further enquiry as to any claim of those who authorized the transfer; and if appellee, as we have held on the evidence, cannot be bound for anything which led to that transfer, any breach of trust would fall to the charge of those who were authorized to consummate the transfer, and not to him. Nor can he be held responsible therefor, unless he had notice of the trust. There is no proof of actual notice. When counsel for appellants says there was, and that appellee stultifies himself in saying he does not know the object of the transfer, it is on the assumption that he was a party to it. But if there was any trust it was created by the paper giving authority to Durkee and Bridge to designate to whom the transfer should be made, but no name appeared in that paper, and we have given our opinion that the evidence fails to connect appellee with it in its inception or execution. It cannot be said, therefore, that through it he had actual notice of any trust. But it is contended besides that appellee, being Vice-President and Director as well as stockholder of the company, it was his duty to enquire of complainants for what purpose the stock was transferred to him. If by this is meant that enquiry should have been made as to the purpose of the paper spoken of above, we have seen that it made no transfer to him; and apart from that we know of no law by which, if stock is offered for transfer to an officer or stockholder of a company for a consideration to be given by him, he is any more bound to enquire the purpose than a person not connected with the company. If he is a simple purchaser, there can be no difference between them as to the caution necessary to be exercised in making the purchase. As we understand the rule, he would only be put upon enquiry when he has knowledge of such facts as would lead an honest man, using ordinary caution, to make further enquiries; and be taken to have

notice of the facts about which enquiry should be made when with such knowledge he does not make the enquiry, but avoids making it. Williamson vs. Brown, 15 N. Y. R., 354. We do not think the evidence before us makes a case for the application of this rule; but rather a case falling under the rule that if a person gives to another such evidence of a right to sell his goods as, according to the common understanding of the world, usually accompanies the authority of disposal, or in other words " has given the external *indicia* of the right of disposing of his property," the owner loses the right of reclaiming the property if disposed of under that authority to an honest purchaser who buys for a valuable consideration without notice of any adverse claim. Saltus vs. Everett, 20 Wendell, 268. It is true this rule relates more especially to movable property, but we think its principle will equally apply to the disposition of stock such as is here involved. But admitting the trust so far as Durkee and Bridge are concerned, the more pertinent law is that which protects purchasers for a valuable consideration, without notice, from being held as taking the property purchased subject to the trust. 1 Perry on Trusts, sec. 218; Glinski *et al.* vs. Zawadsla, 8 Fla., 405.

But it is contended by counsel for appellants that if it be true the stock was transferred to Bridge's order and by him to appellee, the latter would be in the position of having taken the stock in payment of an antecedent debt, and in such case he cannot hold against the true owner, because the equities of the owner are superior to his, unless he has paid new consideration without notice of the prior claim. In other words, that appellee is not in the position of one who has acquired stock for a valuable consideration without notice. It is to be observed that the stock was transferred, not to Bridge's order, but to the order of Durkee

and Bridge; and so far as the question of notice is concerned, we have found on the evidence that none is brought home to appellee. But on the authority of the cases cited in support of the contention, an antecedent debt is not a sufficient consideration. 8 Fla., *supra*; Hay vs. Coddington, 5 John. Chan., 54; Stalker vs. McDonald, 6 Hill, 93. Admitting that to be the law, the facts of this case do not justify the restriction of the consideration to the payment of an antecedent debt. It is true the satisfaction of the indebtedness of Bridge to appellee was a part of the consideration, but that was not all. The note of the company endorsed by Durkee and Bridge was surrendered, and the bond of Bridge as cashier of appellee's bank was cancelled, and these come within what constitutes valuable consideration even according to the authorities on behalf of appellants. The 8th Fla. case expressly recognizes the " giving up of a security " as an actual consideration, though holding that a title based on a pre-existing debt is not sufficient. The same rule is recognized in the 6th Hill case. So it is apparent that the doctrine invoked for appellants against the consideration for the stock transferred to appellee cannot avail them.

On the whole, then, our conclusion is that the evidence fails to show that appellee acquired the stock coupled with a trust; and that it does show that he acquired it for a valuable consideration and without notice of any trust.

These conclusions render it unnecessary to determine other questions in the case. It may be remarked, however, that two of the parties to the bill, Foster and Reed, are not shown to have had any interest in the stock transferred to defendant, which forms the basis of the suit.

The decree is reversed and the bill dismissed.